

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00178-CR

GREGORY SHAWN HENLEY                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 5 OF TARRANT COUNTY
## TRIAL COURT NO. 1277030

----------

## OPINION

----------

A jury convicted Appellant Gregory Shawn Henley of assault causing bodily injury to a family member, his former wife Brandy. The trial court sentenced him to 200 days' confinement in the Tarrant County Jail. In two issues, Appellant argues that (1) the trial court abused its discretion by excluding evidence showing that his conduct was justified as an act in defense of a third party and (2) the trial court improperly limited his right to cross-examine and

confront the witnesses against him by excluding extrinsic proof of Appellant's statements to the complainant and her mother. Because we hold that the trial court reversibly erred by preventing Appellant from presenting his defense and by improperly limiting his right to confront and cross-examine the witnesses against him, we reverse the trial court's judgment and remand this cause to the trial court.

**Summary of Facts**

In 2012, Appellant and Brandy were involved in a custody case regarding their two sons, J.H. and S.H. The two sons lived with Appellant. The family court ordered that Brandy's visits with the children be supervised and that her then-fiancé (now husband) Douglas have no contact with the two sons. These orders resulted from allegations that in 2011, the two boys had been sexually abused by Douglas's stepson, A.G. Brandy's mother was designated as someone who could supervise Brandy's visits with the children.

On March 3, 2012, Brandy and her mother drove to Appellant's home to pick up the two children for Brandy's visit. Appellant told Brandy that he wanted to talk to her, but she refused to speak to him other than to tell him to bring the children out to the car. Appellant did not initially bring the children to the car, but after Brandy dialed 9-1-1, he brought the two boys and put them in her car. Brandy told the 9-1-1 operator that she wanted to make a complaint, and the operator told her to stay until a police officer arrived.

2

After Brandy continued to refuse to speak to him, Appellant grabbed the door handle of the driver's side door and pulled on it, breaking it. Brandy opened the door to pick up the door handle, and Appellant pulled her from the car by her hair. Appellant dragged her to the ground, held her down with his knees, punched her in the face, and banged her head on the ground. Appellant then got up and walked to his driveway, made a phone call on his cell phone, and drove away in his vehicle. Brandy called 9-1-1 again to report the incident.

At trial, Appellant sought to introduce evidence about his motivation for his actions. The trial court allowed him to elicit testimony from Brandy outside the jury's presence. Brandy acknowledged in questioning by Appellant's counsel that the children had been sexually abused by Douglas's stepson, A.G., that one of her sons had made an allegation that Douglas had choked them, and that she had lied to the family court about the fact that she was still living with Douglas.

The State objected that allegations of acts that took place in August 2011 were too remote in time to be considered relevant to Appellant's acts on March 3, 2012. It also argued that, to the extent that Appellant wanted to introduce testimony about statements that one of the sons had made in counseling the week before March 3, 2012, those statements were also too remote. The State argued that for defense of a third person, "there has to be the immediate and necessary intervention," and "[o]ne week prior is not immediate." The trial court ruled that based on the evidence it had heard to that point, it was "not going to allow [Appellant] to go into that."

3

Defense counsel then argued that the testimony of Brandy's mother that Appellant "becomes irate and that is the reason that they didn't want to engage with him" left the jury "with a misunderstanding and incomplete impression about [his] state of mind and the reason that he may become irate, which is that his children have been abused while in her care." Defense counsel argued that he "should be able to clear that up by going into the reason [that Appellant] has been irate in the past." The trial court excluded the evidence.

The trial court allowed Appellant to testify outside the presence of the jury for purposes of making a bill and allowing the trial court to hear evidence to reconsider its ruling:

> Q. Now, you said that the conditions—or explain to the Court what it is that happened to the boys that gave you such concern.
>
> A. The week prior to her showing up to pick up the boys, we were in counseling, and I had S.H.[1] on my arm because he wanted me in the counseling with him to go through everything. And throughout the—S.H. coming out—S.H. was explaining how A.G. would make him and his brother sleep with each other in front of him and—
>
> Q. Was that new information?
>
> A. That was new at that time.
>
> Q. And how—in relation to March 3rd, when did that conversation happen?

[1]Throughout the quoted passages in this opinion, the children's names have been replaced with initials.

A. I'm not sure if it was the Thursday before or the Thursday before. It was one of the Thursdays before. It was the first time I had seen her since the allegation. More allegations had come out.

Q. And did S.H. say anything that gave you concerns about whether Brandy knew about the allegation?

A. S.H. said that his brother had told his mom.

THE COURT: I'm sorry. What?

A. He had—S.H. said that his brother had told his mom, which stayed in line with what J.H. had said all along.

Q. What do you mean what J.H.—what had J.H. said all along?

A. Ever since the allegations were first made, J.H. has always said that "I told my mommy about what A.G. was doing and that she told me that her and Douglas would take care of it."

Which I don't know if you know ADD kids, but to continually hold the same story for months and months on end is not—not a normal situation.

Q. And so that's what J.H. has maintained the entire time; is that right?

A. Yes.

Q. But in this counseling session was the first time S.H. had told you that his mother knew about it?

A. Yes.

Q. And so her picking the children up this next time was the first time she was going to take possession of the children after S.H. had corroborated what you had said?

A. Yes, sir.

Q. Did you also have any concerns about—and, of course, when we're talking about that, we're talking about the abuse that A.G. perpetrated; is that right?

A. Yes, sir.

Q. Did you have any concerns about whether Douglas abused your boys?

A. Yes, sir.

Q. Explain to the Court your concerns about that.

A. The end of July, right before Brandy went on—right before her summer was over, I was picking up the boys every Thursday and spending Thursday with them, and on the way home—because throughout the whole relationship of Brandy and Douglas, I always got weird stories. So I always checked with my boys to make sure there wasn't anything strange going on.

And S.H. said that he was being choked by Douglas. J.H. corroborated and said, yeah, that's happening.

And I kind of got really upset and I held off. We drove a little bit longer, and then I talked to them again, and they were like, yeah. And then I was upset. I called their mother to talk to her about it, and she denied it like everything else.

Then the next morning, after everything was a little bit calmer, I was calmer, I started talking to S.H. S.H. told me—I was like: Show me exactly what choking is, because I didn't want him to be confusing it with anything else.

And the choking went from—he put his hand on my throat, and that's when I knew what he was talking about.

Q. S.H. put his hand on your throat?

A. Yes.

Q. Now, when you called Brandy about this, was she dismissive? You said she didn't believe—

A. Yeah, she said it didn't happen.

6

Q. And was that the same attitude she's had about the abuse?

A. Pretty much, yes.

Q. And—kind of all of that experience you have had with Brandy, Douglas, and A.G., did that contribute to your motivation on March 3rd?

A. I believe so, yes.

Q. And did you have a conversation with Brandy on March 3rd?

A. Yes.

Q. And when she came to pick up the boys, did you talk to her about anything?

A. Yes.

Q. What did you talk to her about, or what did you try to talk to her about?

A. I tried to talk to her about what was going on with S.H.

Q. What do you mean what was going on with S.H.?

A. What he was coming—what he was coming out with in counseling, about having to be forced to have sex with his brother.

Q. So you tried to tell her what he said in counseling whenever she came to pick them up?

A. Yes.

Q. And how did she respond to that?

A. Just dismissed it.

Q. And did you just tell her once, and she said, I don't want to talk about it, or did you try to talk to her?

A. I kept trying to talk to her. And then that's when she went and said—asked me for the boys, and I said: No, you're not

7

getting the boys. And that's when she called the police the first time.

Q.  And then did you go get the boys at that point?

A.  I went to the door and hollered at them to come out.

Q.  After the boys were in the car, did you continue to try to talk to Brandy and her mother, Wendy?

A.  Yeah. I started pleading with them, and I went over the whole J.H. knows, S.H. knows, all the ordeal with how it all turned out, how this wasn't a one-time deal, that S.H. had said it happened in the middle of the day while you were watching TV, how can you do this, how can you continue on this path.

Q.  And Wendy, that was there, was she responsive to what you were telling?

A.  No. She just totally ignored it like it wasn't anything.

Q.  But she was the person that was supposed to be supervising the visits?

A.  Yes.

Q.  And so did that contribute to your belief that they were going to put your boys in a dangerous situation?

A.  Yes.

Q.  Do you believe that your children being in their mother's care was a danger to them?

A.  Yes.

. . . .

Q.  And I think you kind of said this in the course of one of the answers, but I want to be clear.

    Was—the abuse that the boys reported to you, was it one time, or was it ongoing?

A.  That I heard about the abuse?

8

Q.    Yes, what the boys reported to you.

A.    It was a slow process through counseling.  And I never talked to them outside of the counseling, because that's what our court order was, but the boys always wanted me to go in to counseling with them.

Q.    What I'm asking is, as far as you know, did the abuse occur—the sexual abuse occur one time, or did it occur multiple times?

A.    It occurred multiple times.

Q.    And all of those times during—while they were in Brandy's care?

A.    Yes.

Q.    And your actions on March 3rd were to defend your boys from what you perceived as an imminent threat to the boys?

A.    Yes.

In his testimony outside the jury's presence, Appellant stated that when Brandy came to pick up the children on March 3, he believed that she was going to violate the family court's order.  He stated that in counseling the week before, S.H. said that J.H. had told Brandy about the sexual abuse during the time period it was happening, corroborating statements that J.H. had previously made. Appellant said that the counseling session was the first time that S.H. had said that his mother had known about the abuse, and March 3 was the first time that Appellant had seen her since that counseling session.  Appellant stated that J.H. also corroborated his brother's statements that Douglas had choked them.  When Appellant called Brandy to ask her about the boys' allegations, she denied them.

9

Appellant stated that on March 3, he tried to talk to Brandy about S.H.'s statements, but she refused. Neither Brandy nor her mother would talk to him about it, and he believed that his children would be in danger while in Brandy's care.

At the conclusion of Appellant's testimony outside the jury's presence, Appellant's counsel argued that the evidence that

- the "abuse was ongoing,"

- Appellant learned from S.H. for the first time the week before March 3 that Brandy knew about the abuse,

- Brandy admitted that she lied to the family court, and

- she and her mother refused to talk to Appellant about S.H.'s statements

all "go[] to the reasonableness of [Appellant] and the actions that he took to keep her from taking th[e] children away."

The State argued that the information had been learned in counseling the week before and that "if it was a week prior, . . . there's no immediacy there." The trial court declined to change its ruling that the evidence did not raise the issue of defense of a third party.

The defense also argued that the evidence was admissible to show Appellant's then existing state of mind:

> And the statement of my client's character for being someone that becomes irate leaves the jury with a misunderstanding and incomplete impression about my client's state of mind and the reason that he may become irate, which is that his children have been abused while in her care.

10

And I believe that Ms. Kennedy's statement elicited by the Government's direct examination has left the jurors with a misunderstanding, and I should be able to clear that up by going into the reason he has been irate in the past.

After further discussion, defense counsel re-urged his request to present the evidence before the jury:

Also, I would reurge my bill with regard to [Appellant's] testimony and the above aforementioned that . . . limiting his right to elicit complete testimony before the jurors violates his due process and due course of law rights under the Texas Constitution, Article 1, Section 19; Texas Code of Criminal Procedure 1.04; and U.S. Constitution, Fifth Amendment, Fourteenth Amendment.

The trial court denied this request to show Appellant's then-existing state of mind and to correct any misleading characterization of Appellant's state of mind. The trial court had also refused to allow Appellant to disclose the reason Brandy's access to the children was limited to supervised visitation.

Appellant did not testify before the jury.

The prosecutor argued in the State's closing argument, "What excuse? Did you hear any? Of course not, because there is no excuse."

**Analysis**

Both of Appellant's issues complain of the exclusion of evidence. We review a trial court's decision to exclude evidence for an abuse of discretion.[2] A

---

[2]*Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

11

trial court does not abuse its discretion as long as the decision to exclude the evidence is within the zone of reasonable disagreement.[3]

The abuse of discretion standard, however, is viewed in light of and subject to constitutional protections. The Supreme Court of the United States reminds us that while states "have broad latitude under the Constitution to establish rules excluding evidence from criminal trial," "[t]his latitude . . . has limits. . . . [T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."[4] Further, "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence."[5] Thus, a trial judge whose evidentiary ruling undermines or disregards a constitutional protection abuses his discretion; such a ruling cannot be within the zone of reasonable disagreement.[6]

---

[3]*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

[4]*Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006) (citations and internal quotation marks omitted).

[5]*Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146–47 (1986) (citations and internal quotation marks omitted).

[6]*See Holmes*, 547 U.S. at 324, 126 S. Ct. at 1731; *Crane*, 476 U.S. at 689–91, 106 S. Ct. at 2146–47; *State v. Ballard*, 987 S.W.2d 889, 893 (Tex. Crim. App. 1999) ("Misapplication of the law to the facts of a particular case is a per se abuse of discretion.").

**Defense of a Third Party**

In his first issue, Appellant contends that the trial court reversibly erred by refusing to allow him to introduce evidence of why he felt his attack on Brandy was justified as an act in defense of a third party. Appellant correctly argues that the elements of that defense are that (1) under the circumstances as the actor reasonably believed them to be, (2) the actor would be justified in using force under section 9.31 of the penal code to protect himself, and (3) the actor reasonably believes that his intervention is immediately necessary to protect the third person.[7] Defense of a third person is a confession and avoidance defense.[8] The defendant must admit the elements of the offense and then seek to justify his actions.[9] The defendant's testimony alone may be sufficient to raise a defensive theory requiring an instruction in the charge.[10] The defendant must admit to the conduct—act and culpable mental state—of the charged offense to be entitled to the instruction.[11] The self-defense and defense-of-third-person

---

[7]Tex. Penal Code Ann. § 9.33 (West 2011); *see id.* § 9.31.

[8]*Campos v State*, No. 13-11-00705-CR, 2014 WL 895515, at *9 (Tex. App.—Corpus Christi Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (citing *Cornet v. State*, 417 S.W.3d 446, 451–52 (Tex. Crim. App. 2013), and *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1059 (2008)).

[9]*Id.*

[10]*Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997).

statutes are not limited to particular crimes; they simply provide that a person's use of force or deadly force is justified if certain circumstances are met.[12]

The Texas Court of Criminal Appeals instructs us that "the focus of the defense-of-third-persons defense is upon what the actor reasonably believes concerning the situation of the third person."[13] If a defendant reasonably believed that the person he sought to protect was legitimately defending himself, then the defendant would be entitled to the presumption that his belief that the force was immediately necessary was reasonable,[14] even if his belief was actually incorrect.[15] Thus, if the evidence is admitted, the defense must be submitted to the jury. The trial court does not decide that the defense will not be successful when determining whether to admit the evidence of the defense. It is the jury alone who determines whether a defendant has successfully proved his defense.

Here, Appellant presented his theory of defense of a third party in voir dire and admitted to the elements of the offense of assault of a family member

---

[11]*Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010) ("The confession and avoidance doctrine applies to the necessity defense.").

[12]*Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).

[13]*Id.* at 8.

[14]Tex. Penal Code Ann. § 9.31.

[15]*Morales*, 357 S.W.3d at 8.

14

through his opening statement but was not allowed to present his justification defense. At that point, he was stuck in an impossible situation. He upheld the first portion of his burden by admitting to the elements of the crime alleged but was precluded from offering the evidence to show justification. Instead, the jury heard the evidence that Appellant, after assaulting the complainant for no apparent reason, got into his car and left the scene, leaving the children with her.

Appellant was entitled to present his defense.

In *Fielder v. State*, Fielder attempted to present her battered-spouse defense.[16] Just as defense of a third party is central to Appellant's defense here, the battered-spouse defense was the essence of Fielder's defense.[17] The Texas Court of Criminal Appeals reversed Fielder's conviction, holding that the trial court reversibly erred by refusing to allow her to offer the evidence.[18]

In the case before us, the State argued that the evidence of the relationship between Appellant and his former wife was too remote to support a finding of sudden passion or the immediate need to defend their sons. The State here argued that because Appellant had learned of the sexual abuse the previous year and because he had learned of additional abuse the week before, there was no immediacy. He could only have acted in defense of his children a

---

[16]756 S.W.2d 309, 317 (Tex. Crim. App. 1988).

[17]*Id.* at 319.

[18]*Id.* at 320–21.

15

week before when the outcry occurred. The State's argument, however, is flawed. An immediate response of sudden passion arising from adequate cause is the test of what used to be voluntary manslaughter and is now a punishment issue in a murder prosecution.[19] Sudden passion is not an element of self-defense or defense of another. The need for immediate action in defense of another does not rest on sudden passion but, rather, on the need to act immediately to protect the other person.

Appellant attempted to talk to Brandy about the children's safety. Brandy and her mother refused to discuss his concerns. The danger that Appellant perceived was not the danger of injury from the counseling that the children had participated in the previous week. The danger that Appellant perceived lay in the children's leaving his home with Brandy. That perceived danger was immediate.

Appellant attempted to argue that the danger lay in allowing the children to go with his former wife because of the history of sexual and physical abuse. Appellant made a proper showing of the evidence that he sought to present to the jury. It was both admissible and probative. We therefore hold that the trial court abused its discretion by excluding the evidence and erred by refusing to allow Appellant to present his defense.

---

[19] *Wooten v. State*, 400 S.W.3d 601, 604–05 (Tex. Crim. App. 2013).

**Denial of Right of Confrontation**

Appellant contends that the State was allowed to present him as an irrationally angry man. As part of his attempt to present his defense of a third person, Appellant tried to explain to the jury the relationship among the parties, his concerns for his children, his state of mind, and the reasons for his actions. He was not permitted to do so. In his second issue, Appellant argues that the trial court improperly limited his right to cross-examine and confront the witnesses against him by not allowing him to question Brandy and her mother about the new allegations that had emerged during the children's counseling concerning abuse during Brandy's times of possession. We agree and hold that the trial court so erred.

Appellant correctly argues that denial of the right of confrontation and cross-examination is an error of constitutional magnitude.[20] And the trial court's error here was exacerbated by the State's jury argument. The Texas Court of Criminal Appeals has recognized that occasionally

> erroneous exclusion of a defendant's evidence of . . . state of mind at the time of the [conduct] amount[s] to constitutional error because the evidence was critical to [the] defense:
>
>> [T]he trial court's exclusion of [the defendant's self-defense evidence] was not mere evidentiary error. It was of constitutional dimension. The ruling went to the heart of the defense. Petitioner's sole defense was that she killed her husband in an honest belief that she

---

[20] *See Davis v. Alaska*, 415 U.S. 308, 320, 94 S. Ct. 1105, 1112 (1974).

17

needed to do so to save her life. The success of the defense depended almost entirely on the jury's believing petitioner's testimony about her state of mind at the time of the shooting. . . . The trial court precluded petitioner from testifying fully about her state of mind and from presenting evidence that would have corroborated her testimony. Because this evidence was critical to her ability to defend against the charge, we hold that the exclusion of this evidence violated petitioner's clearly established constitutional right to due process of law— the right to present a valid defense as established by the Supreme Court in *Chambers* [*v. Mississippi*] and *Washington* [*v. Texas*].[21]

Similarly, Appellant in the case now before this court had received information that, contrary to prior representations, Brandy knew about the sexual and physical abuse but neither stopped it nor told the truth when asked about it by the family court judge. The trial court abused its discretion by excluding the evidence and in doing so, erred by denying Appellant the right to confront and cross-examine Brandy and her mother to further show his state of mind and further develop his justification defense.

**Harm**

Just as the trial court's errors of excluding Appellant's testimony justifying his actions and preventing him from cross-examining Brandy and her mother about the bases for his actions and his state of mind overlap, so does the harm caused by both errors. The right to present a complete defense is rooted in the constitutional right to due process under both the Fifth and Fourteenth

---

[21] *Potier v. State*, 68 S.W.3d 657, 663–64 (Tex. Crim. App. 2002) (quoting *DePetris v. Kuykendall*, 239 F.3d 1057, 1062–63 (9th Cir. 2001)).

Amendments to the United States Constitution; the right to due course of law under article one, section nineteen of the Texas Constitution; the Sixth Amendment right to confront and cross-examine witnesses; and the same right under article one, section ten of the Texas Constitution.[22]  The Texas Court of Criminal Appeals has reminded us of the importance of a defendant's being allowed to present a complete defense, stating,

> In *Holmes v. South Carolina*, the Supreme Court stated, "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  In the case before us, the trial court's ruling disallowing cross-examination of the State's expert witness violated the defendant's fundamental rights to a fair trial.  The Supreme Court said in *Pointer v. Texas*:
>
>> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.  Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.
>
> Because the denial of the right to present a defense is a violation of due process and results in constitutional error, we now turn to the harm analysis.[23]

---

[22]U.S. Const. amends. V, VI, XIV; Tex. Const. art. I, §§ 10, 19.

[23]*Holmes v. State*, 323 S.W.3d 163, 173 (Tex. Crim. App. 2009) (op. on reh'g) (citations omitted).

19

The deprivation of the meaningful right to present a defense is constitutional error.[24] We therefore apply rule 44.2(a).[25] The question is whether both errors were harmless beyond a reasonable doubt.[26] In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction.[27]

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence.[28] We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt (that particular) error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a

---

[24] *Holmes*, 547 U.S. at 324, 126 S. Ct. at 1731; *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967); *Holmes*, 323 S.W.3d at 173–74.

[25] Tex. R. App. P. 44.2(a).

[26] *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997).

[27] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

[28] *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).

juror would probably place on the error.[29]  This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution."[30]

In the case now before this court, Appellant attempted to justify his conduct to the jury.  He tried to explain to the jury the source of his anger and his concern for his children.  His claim that he was acting to protect his children was his defense.  Moreover, the State made Appellant's state of mind an issue in the case, creating the impression that his anger was irrational and baseless.  The jury heard the evidence that Appellant, after assaulting the complainant, got into his car and left the scene, leaving the children with her.

Justifying his conduct based on the defense of a third party was Appellant's entire defense.  At every turn, he was barred from presenting evidence of his defense to the jury.

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we cannot say that the trial court's errors did not

---

[29]*Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)).

[30]*Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22 (citation and internal quotation marks omitted).

contribute to Appellant's conviction or punishment.[31] We therefore sustain Appellant's two issues.

**Conclusion**

Having sustained Appellant's two issues, we reverse the trial court's judgment and remand this case to the trial court.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

GARDNER, J., filed a concurring opinion.

PUBLISH

DELIVERED: December 18, 2014

---

[31]*See* Tex. R. App. P. 44.2(a).