PD-1076-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/23/2015 8:10:04 AM
Accepted 3/24/2015 8:56:04 AM
ABEL ACOSTA
CLERK

# IN THE TEXAS COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| RICARDO BELTRAN, | § | CCA No. PD-1076–14 |
| *APPELLANT* | § | |
| | § | |
| V. | § | COA No. 05-12-01647-CR |
| | § | |
| THE STATE OF TEXAS, | § | |
| *APPELLEE* | § | TC No. F10-56077-M |

*APPEALED FROM CAUSE NUMBER F10-56077-M IN THE 194th JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS; THE HONORABLE ERNEST WHITE, JUDGE PRESIDING; AFFIRMED BY THE HONORABLE FIFTH COURT OF APPEALS IN CAUSE NUMBER 05-12-01647-CR.*

§ § §

## STATE'S RESPONSE BRIEF ON APPELLANT BELTRAN'S PETITION FOR DISCRETIONARY REVIEW

§ § §

SUSAN HAWK
Criminal District Attorney
Dallas County, Texas


MICHAEL R. CASILLAS, Assistant
Criminal District Attorney,
Appellate Division
133 N. Riverfront Blvd., LB 19
Dallas, Texas 75207-4399
(214) 653-3600/FAX (214) 653-3643
State Bar No. 03967500
Michael.Casillas@dallascounty.org
Mcasillas@dallascounty.org

**SUBJECT INDEX/TABLE OF CONTENTS**

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY STATEMENT OF THE ISSUES PRESENTED . . . . . . . . . . . . . . 5

ARGUMENT AND AUTHORITIES

    <u>Factual Record's Establishment Of Inapplicability Of Sudden Passion</u>

    The Fifth Court Of Appeals Did Not Err In Affirming The Trial
    Court's Judgment Because Beltran's Testimony Could In No Way
    Support A Finding Of Sudden Passion By A Rational Jury. . . . . . . . . . . . 8

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE/PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# INDEX OF AUTHORITIES

**<u>CASES</u>**                                                                  **<u>PAGES</u>**

Beltran v. State, No. 05-12-01647-CR,
2014 Tex. App. LEXIS 7915 (Tex.
App. – Dallas July 22, 2014, pet.
granted)(not designated for publication) . . . . . . . . . . . . . . . . . . . 2,4,7,9,10,16

Daniels v. State, 645 S.W.2d 459 (Tex. Crim. App. 1983) . . . . . . . . . . . . . . 9,11,12

Fry v. State, 915 S.W.2d 554 (Tex. App. –
Houston [14[th] Dist.] 1995, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,12

Gonzales v. State, 717 S.W.2d 355 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . 12

Gross v. State, 380 S.W.3d 181 (Tex. Crim. App. 2012) . . . . . . . . . . . . . . . . . . 20

Henley v. State, No. 02-13-00178-CR, 2014 Tex.
App. LEXIS 13562 (Tex. App. – Fort Worth
December 18, 2014, no pet.)(not yet reported) . . . . . . . . . . . . . . . . . . . . . 13

Jones v. State, 687 S.W.2d 425 (Tex.
App. – Dallas 1985, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,12

Mathis v. State, 67 S.W.3d 918 (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . 13,14

McKinney v. State, 179 S.W.3d 565 (Tex. Crim. App. 2005) . . . . . . . . . . 8,9,11,12

Moore v. State, 969 S.W.2d 4 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . 8,12

Moye v. State, No. 05-94-00841-CR, 1997 Tex. App.
LEXIS 1952 (Tex. App . – Dallas April 16,
1997, no pet.)(not designated for publication) . . . . . . . . . . . . . . . . . . . . 9,12

Thompson v. State, 236 S.W.3d 787 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . 19

Trevino v. State, 100 S.W.3d 232 (Tex. Crim. App. 2003)  . . . . . . . . . . . . . . . . . . 8

Troncoso v. State, No. 06-03-00065-CR, 2004 Tex. App.
    LEXIS 2578 (Tex. App. – Texarkana March 24,
    2004, pet. ref'd)(not designated for publication)   . . . . . . . . . . . . . . . . . . 9,12

Wooten v. State, 400 S.W.3d 601 (Tex. Crim. App. 2013)  . . . . . . . . . . . . . . . . 8,11

## ARTICLES,  RULES,  CODES,  AND CONSTITUTIONS

Tex. Pen. Code  §6.04   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Tex. Pen. Code  §7.01   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Tex. Pen. Code  §7.02   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Tex. Pen. Code §19.02(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

IN THE TEXAS COURT OF CRIMINAL APPEALS

| RICARDO BELTRAN, | § | CCA No. PD-1076–14 |
|---|---|---|
| APPELLANT | § | |
| | § | |
| V. | § | COA No. 05-12-01647-CR |
| | § | |
| THE STATE OF TEXAS, | § | |
| APPELLEE | § | TC No. F10-56077-M |

*APPEALED FROM CAUSE NUMBER F10-56077-M IN THE 194th JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS; THE HONORABLE ERNEST WHITE, JUDGE PRESIDING; AFFIRMED BY THE HONORABLE FIFTH COURT OF APPEALS IN CAUSE NUMBER 05-12-01647-CR.*

TO THE HONORABLE TEXAS COURT OF CRIMINAL APPEALS:

## **STATEMENT REGARDING ORAL ARGUMENT**

The decision of the Fifth Court of Appeals is correct and deserving of this Court's approval. Even though the unique underlying substantive issues involved in the instant case and the potential ramifications of this Court's decision relative thereto could have far reaching consequences for the jurisprudence of the State of Texas, the instant case is one in which this Court has already declined to extend to the parties the privilege of presenting oral argument. Based on the state of the record and the nature of the legal issues involved, the State finds itself in complete agreement as to this Court's previous decision that refused to grant the parties the privilege of presenting oral argument.

1

## PRELIMINARY STATEMENT OF THE CASE

Appellant/Petitioner (hereinafter "Beltran") was charged via indictment with capital murder for his role in having killed Sheldon McKnight. (CR-O: 13).[1] Beltran testified in his own defense not only during guilt-innocence, but also punishment. (RR-7: 64-170; RR-9: 43-68). As the Fifth Court noted, "The sole witness to testify as to the circumstances surrounding McKnight's death was Beltran." Beltran v. State, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *2 (Tex. App. – Dallas July 22, 2014, pet. granted)(not designated for publication).

Beltran testified that he had gone to McKnight's apartment with Victor Ramos and, after having used drugs, had fallen asleep on a bed in McKnight's residence – only to be awakened by the sensation of having his anus licked by McKnight. (RR-7: 103; RR-9: 59). Beltran testified that he panicked and screamed and then felt McKnight – who outweighed Beltran by a substantial amount – jump on Beltran's back and then start pushing Beltran's face into a pillow. (RR-7: 103-06).

In response to Beltran's screams, Ramos came into the room and hit McKnight in the head, which caused McKnight to fall on top of Beltran. (RR-7: 106). When

---

[1]The appellate record in this case includes an original Clerk's Record and two supplemental Clerk's Records. The abbreviation "CR-O" refers to the original Clerk's Record and the abbreviation "CR-S" followed by a 1 or a 2 refers to the first or second volume of the supplemental Clerk's Record.

2

McKnight moved to grab Ramos, Beltran grabbed McKnight from behind. (RR-7: 107, 151-52). Beltran expressly testified, "Once I grabbed him [*i.e.*, McKnight], I was telling [Ramos], get some help." (RR-7: 107). According to Beltran, Ramos grabbed McKnight's leg and McKnight and Beltran fell back on McKnight's bed. (RR-7: 107-08). Beltran made clear that he continued to hold McKnight and continued to tell Ramos to get some help and that he was screaming, "Get some help" to Ramos. (RR-7: 107-08).

Beltran asserted that it was only at this point in the events that he saw Ramos produce a knife and proceed to stab McKnight with the knife. (RR-7: 108). Even though McKnight started to flail around and attempted to go after Ramos, Beltran continued to hold McKnight as he was kicking and continued to tell Ramos, "Get some help." (RR-7: 108). Beltran had the presence of mind to tell Ramos not only to get some help, but also to stop stabbing McKnight even after having seen Ramos stab McKnight in the face. (RR-7: 150-51). After having seen Ramos stab McKnight in the face, Beltran eventually released his grip on McKnight and got out from under McKnight, only to see Ramos stab McKnight to death. (RR-7: 108-10, 154). Beltran made clear that he had not held McKnight for the purpose of helping Ramos stab McKnight, but had held McKnight for his own defense and for the defense of Ramos. (RR-7: 110).

3

While the trial court's guilt-innocence charge contained an instruction on self-defense, the jury rejected Beltran's self-defense claim and found Beltran guilty of the lesser included offense of murder. (CR-O: 51, 54-60; CR-S-1: 4-18). At punishment, the trial court refused to instruct the jury on the defensive issue of sudden passion. (RR-9: 70-71). The trial court explained that the defensive issue was not being submitted because Beltran had repeatedly denied having killed McKnight and because Beltran had admitted that, before he grabbed McKnight, McKnight had been getting off of Beltran and moving toward Ramos. (RR-9: 70-71).

The Fifth Court affirmed the trial court's refusal to instruct the jury on sudden passion, noting that Beltran had been "consciously aware of the danger McKnight [had] posed, [had] tried to get control of the situation, and [had] acted with thought, not in an excited and agitated state." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *8. Accordingly, the Fifth Court wrote, "On this record, we conclude there is no evidence Beltran caused McKnight's death under the immediate influence of sudden passion. Accordingly, the record does not 'minimally support' a causal connection between the provocation and homicide." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *9.

Beltran then filed his Petition for Discretionary Review, which this Court

4

granted.[2]  In his sole ground for review, Beltran contended that some evidence that Beltran acted in self-defense did not negate all the evidence that he acted in sudden passion.[3]

## SUMMARY STATEMENT OF THE ISSUES PRESENTED

Beltran's ground for review contends that the logic of the Fifth Court's analysis was flawed because any evidence that Beltran acted in self-defense failed to negate the evidence that Beltran acted while under the influence of sudden passion.  Thus, Beltran contends that this Court should reverse the judgment of the Fifth Court and remand the case to the Fifth Court for the Fifth Court to conduct a harm analysis of whether Beltran was harmed by the trial court's refusal to submit the sudden passion instruction.[4]

Regarding Beltran's ground for review, a sudden passion instruction may not be provided unless the record contains evidence from which a jury could rationally conclude that the defendant on trial committed the offense while he was under the influence of sudden passion that had rendered him incapable of cool reflection.  Since the record was undisputed regarding how Beltran's own testimony had showed that he

_____

[2]*See* Beltran's Petition For Discretionary Review ("PDR"), at pp. 1-19.

[3]*See* Beltran's PDR, at pp. 1-19.

[4]*See* Beltran's PDR, at p. 20.

5

had never been rendered incapable of cool reflection and since the Fifth Court expressly relied on that very testimony of Beltran's, Beltran was not entitled to the submission of a sudden passion instruction because the record was such that no rational jury could have found that Beltran had acted while in the throes of sudden passion. Accordingly, this Court's opinion should not only affirm the judgment of the Fifth Court, but also should reiterate that a sudden passion instruction may not be provided when the record is such that a rational jury could not find that the defendant had acted while in the throes of sudden passion.

For all the aforementioned reasons, this Court should either deem the granting of Beltran's petition for discretionary review improvident or should issue an opinion that affirms the judgment of the Fifth Court by reiterating that a sudden passion instruction may not be provided when the record is such that no rational jury could make a finding a sudden passion based on that record.

## ARGUMENT AND AUTHORITIES

In substance, Beltran contends that the Fifth Court erred by concluding that Beltran's testimony that he had acted in self-defense negated Beltran's testimony that he had acted while under the influence of sudden passion.[5] While Beltran's argument asserts that the Fifth Court's opinion concluded that evidence of Beltran's having acted in self-defense negated Beltran's testimony that Beltran had acted while under the influence of sudden passion, the Fifth Court's opinion actually stated that Beltran's `testimony had shown that Beltran had "acted with thought, . . ." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *8. Since this Court's jurisprudence is clear regarding how the evidence must show that the defendant actually acted under an influence so great that it caused him to lose his capacity for cool reflection and that a sudden passion instruction should be provided only when the record is such that a rational jury could find that the defendant had acted while under the influence of sudden passion, the Fifth Court did not err in affirming the trial court's judgment of conviction because Beltran's own testimony repeatedly demonstrated that Beltran had never been rendered incapable of cool reflection. Accordingly, a finding of sudden passion was not one that a rational jury could have made on the record in the instant case.

---

[5]*See* Beltran's Merit Brief, at pp. 1-21.

**Factual Record's Establishment Of Inapplicability Of Sudden Passion**

**The Fifth Court Of Appeals Did Not Err In Affirming The Trial Court's Judgment Because Beltran's Testimony Could In No Way Support A Finding Of Sudden Passion By A Rational Jury.**

A finding that a defendant committed a murder while under the immediate influence of sudden passion can render the murder committed a second degree felony instead of a first degree felony. *See, e.g.*, Trevino v. State, 100 S.W.3d 232, 237 (Tex. Crim. App. 2003). The defendant bears the burden of proving sudden passion by a preponderance of the evidence. *See* Tex. Pen. Code §19.02(d); Trevino, 100 S.W.3d at 237.

In order for sudden passion to be an issue that should be submitted to the jury, there must be evidence that the defendant on trial "actually acted under the influence of a fear so great that it caused him to lose his capacity for cool reflection." Wooten v. State, 400 S.W.3d 601, 609 (Tex. Crim. App. 2013). While the evidence that entitles a defendant to submission of the sudden passion instruction may be strong, weak, contradicted, unimpeached, or unbelievable, the evidence "cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury." McKinney v. State, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005); Moore v. State, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998). When the evidence shows that the defendant had not been rendered incapable of cool reflection, the issue of sudden passion should

not be submitted because an essential element of the issue has been refuted, especially in those situations where it is the defendant's own testimony that demonstrates that he or she had not been deprived of his capacity to exercise cool reflection. *See, e.g.*, McKinney, 179 S.W.3d at 570; Daniels v. State, 645 S.W.2d 459, 461 (Tex. Crim. App. 1983); Fry v. State, 915 S.W.2d 554, 558 (Tex. App. – Houston [14th Dist.] 1995, no pet.); *see also, e.g.*, Troncoso v. State, No. 06-03-00065-CR, 2004 Tex. App. LEXIS 2578, at *23-24 (Tex. App. – Texarkana March 24, 2004, pet. ref'd)(not designated for publication); Moye v. State, No. 05-94-00841-CR, 1997 Tex. App. LEXIS 1952, at *31-32 (Tex. App . – Dallas April 16, 1997, no pet.)(not designated for publication), *citing* Jones v. State, 687 S.W.2d 425, 428 (Tex. App. – Dallas 1985, pet. ref'd).

In the instant case, the Fifth Court expressly noted how the evidence had shown that Beltran had been "consciously aware of the danger McKnight [had] posed, [had] tried to get control of the situation, and [had] acted with thought, not in an excited and agitated state." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *8. Accordingly, the Fifth Court wrote, "On this record, we conclude there is no evidence Beltran caused McKnight's death under the immediate influence of sudden passion. Accordingly, the record does not 'minimally support' a causal connection between the provocation and homicide." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS

9

7915, at *9. As such, the opinion of the Fifth Court leaves no doubt that the Fifth Court's conclusion that there had been no evidence that Beltran had acted while under the influence of sudden passion was based on the evidence that showed that Beltran had never been rendered incapable of cool reflection, but actually had "acted with thought." Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *8.

A review of the record reveals the correct nature of the Fifth Court's conclusion. While Beltran claimed more than once that he had panicked, Beltran repeatedly claimed that he had grabbed and held McKnight and that he had told Ramos to seek help. (RR-7: 104-10, 145-52). According to the record, Beltran also admitted that, while Ramos was in the act of stabbing McKnight, Beltran told Ramos to stop. (RR-7: 150-51).

Beltran repeatedly made clear, however, that he had not even moved to grab McKnight until after McKnight had moved to go after Ramos. (RR-7: 107, 151). According to Beltran's own testimony, Beltran grabbed McKnight and told Ramos to go get help not only before Beltran had even noticed that Ramos had a knife, but also during the time that McKnight was flailing around (while being stabbed by Ramos) and even after having seen McKnight get stabbed in the face by Ramos. (RR-7: 104-10, 150).

As such, the record makes clear that Beltran always had the presence of mind

not only to urge Ramos to go and get help, but also to tell Ramos to stop stabbing McKnight. (RR-7: 150-51). If anything, Beltran's own testimony demonstrates that Beltran was not entitled to sudden passion because Beltran's actions were not "emotional responses to provocation," but were "deliberate and done with forethought." McKinney, 179 S.W.3d at 571. Stated differently, Beltran was not entitled to sudden passion because Beltran's testimony establishing the deliberate nature of the combination of his conduct and thought processes meant that Beltran had not "actually acted under the influence of a fear so great that it [had] caused him to lose his capacity for cool reflection." Wooten, 400 S.W.3d at 609.

Under this Court's own long-standing precedent, Beltran's testimony showing that he had never been rendered incapable of cool reflection negated sudden passion as an issue on which the jury should be instructed. In Daniels, Daniels testified that he had shot the victim because he had been in fear that the victim was going to kill him. Daniels, 645 S.W.2d at 461. However, Daniels' testimony on cross-examination showed that Daniels had never lacked the ability for cool reflection. Daniels, 645 S.W.2d at 461. Accordingly, this Court concluded that Daniels' own assessment of the situation had refuted one of the essential elements required to raise the issue of sudden passion, that the actor had been rendered incapable of cool reflection. Daniels, 645 S.W.2d at 461.

11

Moreover, the Daniels opinion is no way constitutes the only time that this Court has concluded that sudden passion was not applicable because the record had shown that the defendant on trial had not been rendered incapable of cool reflection. *See, e.g.*, McKinney, 179 S.W.3d at 550-71; Gonzales v. State, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986). Likewise, Texas jurisprudence contains other examples from the intermediate appellate courts that are entirely consistent with this Court's aforementioned jurisprudence regarding how a jury should not be instructed on sudden passion when the defendant on trial was not rendered incapable of cool reflection. *See, e.g.*, Fry, 915 S.W.2d at 558; Jones, 687 S.W.2d at 428; *see also, e.g.*, Troncoso, No. 06-03-00065-CR, 2004 Tex. App. LEXIS 2578, at *23-24; Moye, No. 05-94-00841-CR, 1997 Tex. App. LEXIS 1952, at *31-32.

Furthermore, this Court's precedents require that a sudden passion instruction is to be provided only if the record is such that a finding of sudden passion was one that a rational jury could make. *See* McKinney, 179 S.W.3d at 569; Moore, 969 S.W.2d at 11. Based on the legal requirements that a defendant must prove sudden passion by a preponderance of the evidence and the record must be such that a rational jury could have found that the defendant had been deprived or his or her ability to engage in cool reflection because he or she had acted while under the immediate influence of sudden passion, the State disagrees with Beltran's contention that evidence

12

of acting in self-defense does not negate evidence of having acted under the influence of sudden passion. While there may be some case with a highly unique set of facts that would in theory support Beltran's contention, sudden passion should not submitted if the record is such that no rational jury could have made a finding of sudden passion based thereon. If the factual record is such that it could not provide the basis for a rational jury to find sudden passion, then evidence that supports self-defense may well negate sudden passion, especially where – as here – the evidence fails to show that the defendant was rendered incapable of cool reflection. *See, e.g.*, Henley v. State, No. 02-13-00178-CR, 2014 Tex. App. LEXIS 13562, at *17 (Tex. App. – Fort Worth December 18, 2014, no pet.)(not yet reported)("Sudden passion is not an element of self-defense or defense of another. The need for immediate action in defense of another does not rest on sudden passion but, rather, on the need to act immediately to protect the other person.").

Regarding whether a record was sufficient for a rational jury to have made a certain finding based thereon, this Court has – in the context of whether a lesser included offense instruction should have been submitted – provided guidance as to whether the defendant's own testimony had been such that a rational jury could have concluded therefrom that the defendant had been guilty only of the requested lesser included offense. *See* Mathis v. State, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002).

13

In Mathis, this Court assessed Mathis' testimony and concluded – based on the inconsistencies thereof and the physical evidence – that Mathis' testimony had failed to constitute evidence upon which a jury could have rationally found that Mathis' actions towards the victim had been merely reckless. Mathis, 67 S.W.3d at 926.

In the instant case, the record was undisputed that Beltran lied repeatedly when he was interviewed by the police and even initially gave the police a false name. (RR-7: 135-37, 165-66). Beltran's lies to the police included lies about having been at McKnight's apartment before (so as to explain the potential presence of Beltran's DNA and/or fingerprints) and lies about not having had anything to do with McKnight's death. (RR-7: 137, 165-66).

While Beltran's demonstrated willingness to lie was so great that no rational jury would be willing to give credence to anything Beltran had to say in his own favor, the remainder of Beltran's testimony provided further evidence from which no rational jury could have ever found that Beltran had been rendered incapable of cool reflection. Beltran admitted that – almost immediately upon McKnight's death – Beltran himself had taken McKnight's shoes and some of McKnight's clothing because Beltran's own clothing was bloody. (RR-7: 110, 126-27, 155-57). While Beltran tried to claim that he had taken the clothes because he was in a panic, Beltran's having taken the clothes actually proves that Beltran was thinking clearly immediately after the death of

14

McKnight because Beltran's taking of McKnight's clothes solved the dilemma presented by the bloody state of Beltran's own clothes. (RR-7: 110-12).

While Beltran claimed that Ramos was also panicking, Beltran admitted that it was Ramos who had suggested making the crime scene look like McKnight had been the victim of a robbery, which actually seems like more deliberative planning (as opposed to a panicked reaction that occurred without any cool reflection). (RR-7: 112-14). Beltran also admitted that he donned a disguise while loading McKnight's property into McKnight's vehicle, which was still more evidence that Beltran was fully capable of engaging in deliberative conduct soon after the death of McKnight. (RR-7: 120).

While Beltran claimed that he had originally left his clothes and a bloody towel in McKnight's apartment, Beltran admitted the he had still had the presence of mind not only to realize that he had left his clothes and the bloody towel at the crime scene, but also that it was necessary to return to the crime scene and retrieve those items because they could connect him to the crime. (RR-7: 113, 159). Clearly, Beltran's ability to assess accurately that he had left evidence at the crime scene that could connect him thereto – and that he needed to retrieve that evidence – are in no way consistent with a mind that had been rendered incapable of cool reflection.

Once Beltran and Ramos had a collision in McKnight's vehicle, Beltran also

appreciated the potential benefits of taking McKnight's television from the wrecked vehicle. (RR-7: 130-35). Beltran explained that he thought he could use the television either to barter for assistance (such as obtaining a ride or other aid from another person) or as a prop to obscure his identity. (RR-7: 132-33, 143). Moreover, the logic of Beltran's plan was conclusively demonstrated by Beltran's own testimony wherein Beltran admitted that he had actually been able to use McKnight's television in just the way he had planned and had done so by trading it to a black male who offered to let Beltran and Ramos hide in a nearby house to which the black male had access. (RR-7: 132-35). When the black male informed Beltran that he and Ramos needed to leave, Beltran still had the presence of mind to ask the black male if leaving by the back door would be acceptable. (RR-7: 133-34).

For all the aforementioned reasons, the Fifth Court in no way erred by concluding that the trial court's refusal to submit the sudden passion instruction constituted no error whatsoever. Beltran, No. 05-12-01647-CR, 2014 Tex. App. LEXIS 7915, at *8-9. However, the legal principles discussed so far herein are not the only reasons why the judgment of the Fifth Court should be affirmed. Based on the unique facts of the instant case, Beltran is in a very real sense arguing in effect for recognition in the law that the concept of sudden passion should have some type of component whereby the basis for the alleged sudden passion may be either transferred

16

to another or exercised vicariously.

Had Beltran claimed that he had grabbed McKnight and had then continued to restrain McKnight even while Ramos was stabbing McKnight because Beltran himself had been so enraged and terrified by McKnight's conduct in sexually assaulting Beltran and then trying to smother Beltran, then perhaps, Beltran's testimony would have been sufficient for a rational jury to have found sudden passion therefrom. However, Beltran never asserted that his act of holding McKnight had been something that Beltran had done as a result of having had his capacity to engage in cool reflection overcome by his fear, terror, or rage.

Moreover, Beltran repeatedly claimed that he had never intended to harm McKnight, that all he had done was hold McKnight while he himself was telling Ramos to get help, and that he had never stabbed McKnight nor intended to assist or facilitate Ramos' stabbing of McKnight. (RR-7: 103-10, 119, 138, 145-51; RR-9: 67). According to Beltran's version of the events, only Ramos perpetrated any conduct against McKnight that actually inflicted any killing blows to McKnight. As such, Beltran seems to be claiming that Ramos could stab McKnight based on what McKnight had done to Beltran and that Beltran should receive the sudden passion instruction even though the record contains no evidence that anything was done to Ramos that would have caused Ramos to act in sudden passion or that would have

17

justified Ramos' having acted while under the influence of sudden passion.

While Beltran's having been subjected to having his anus licked by McKnight and having had his face pushed into a pillow might have been the type of conduct that could have justified Beltran's having been rendered incapable of cool reflection, the record is devoid of any evidence that Ramos was subjected to those actions or that Ramos had even known what had caused Beltran initially to scream. While Ramos could well have been justified in attacking McKnight in an effort to defend Beltran, the fact that Ramos might have been justified in acting in defense of Beltran would not necessarily provide any grounds for a conclusion that Ramos' actions had been committed while Ramos was under the influence of sudden passion.

Finally, Beltran repeatedly testified to the effect that he had held McKnight for the purpose of providing Ramos with an opportunity to obtain the help that Beltran was telling Ramos to go get. (RR-7: 107-09, 150-52). While Beltran's having held McKnight undoubtedly facilitated Ramos' stabbing of McKnight, Beltan never claimed that his act of holding McKnight was conduct he had engaged in as a result of having been rendered incapable of cool reflection. (RR-7: 64-170). As discussed earlier, Beltran repeatedly demonstrated that he had never been rendered incapable of cool reflection because he doggedly reiterated that he had held McKnight (while telling Ramos to go get help) because he wanted Ramos to be able to go get help. (RR-7:

18

107-09, 150-52). Clearly, Beltran's having held McKnight (after McKnight had started moving toward Ramos) and Beltran's having admitted having done so while telling Ramos to go obtain help is more akin to acting in a deliberate manner because Beltran's act of holding McKnight is the type of act that would facilitate Ramos' ability to follow Beltran's instructions to go get help by making certain that McKnight did not interfere with Ramos' ability to seek assistance from some other person.

Accordingly, the judgment of the Fifth Court should also be affirmed because – on the record presented herein – a conclusion that Beltran was entitled to sudden passion would amount to a conclusion that the sudden passion that might (under the proper set of facts) pertain to the person who had merely held the victim could somehow be attributed to the person who had actually inflicted the killing blows (even though that person had not been subjected to the acts from which the sudden passion might have arisen). While the State is aware that the law recognizes the concept of transferred intent, the State has found no case recognizing that acting in the throes of sudden passion may be accomplished vicariously or that the cause of sudden passion that might exist as to one person may be transferred to another person who had not experienced what may have inspired the sudden passion in the original person. *See, e.g.*, Tex. Pen. Code §6.04; Thompson v. State, 236 S.W.3d 787, 792 (Tex. Crim. App. 2007). While the State is aware that one person can be legally responsible for the

19

actions of another person under a legal theory such as the law of parties liability, the State has found no case establishing that a second person may been deemed to have acted in sudden passion based on the actions that may have caused sudden passion to exist in a different, original  person, especially when there has been no showing that the second person experienced whatever it was that could have caused sudden passion to exist in the original person.  *See, e.g.*, Tex. Pen. Code  §7.01; Tex. Pen. Code §7.02; <u>Gross v. State</u>, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).  In light of the State's inability to find any case recognizing a legal doctrine of transferred or vicarious sudden passion and based on the record in the instant case, the instant case fails to constitute the type of case in which such a novel legal doctrine should be recognized or promulgated by this Court.

For all the aforementioned reasons and based on all the legal authority cited in support thereof and in conjunction therewith, the ultimate judgment of the Fifth Court should remain unchanged, either through an outright affirmance thereof or through a conclusion that Beltran's petition for discretionary review was improvidently granted.

20

# CONCLUSION AND PRAYER

Since the record more than justified the trial court's refusal to submit the sudden passion instruction, this Court should affirm the judgment of the Fifth Court or dismiss Beltran's petition for discretionary review based on the conclusion that it was improvidently granted.

For all the aforementioned reasons, the State prays that the ultimate judgment of the Fifth Court will be affirmed. Alternatively, the State prays that this Court will conclude that Beltran's petition for discretionary review was improvidently granted.

Respectfully submitted,

SUSAN  HAWK
Criminal District Attorney
Dallas County, Texas

_____
MICHAEL  R.  CASILLAS, Assistant
Criminal District Attorney,
Appellate Division
133 N. Riverfront Blvd., LB 19
Dallas, Texas  75207-4399
(214) 653-3600/FAX (214) 653-3643
State Bar No. 03967500
Michael.Casillas@dallascounty.org
Mcasillas@dallascounty.org

21

## CERTIFICATE/PROOF OF SERVICE

I hereby certify that – no later than March 27, 2015 – a true, electronically-formatted copy of the instant State's Response Brief has been served on opposing co-counsel, the Hon. Robert N. Udashen and the Hon. Brett Ordiway, and has also been served on the State's Prosecuting Attorney, the Hon. Lisa McMinn, by use of the electronic service function that accompanies the State's filing of the instant State's Response Brief with this Court through the electronic filing service provider to which the State subscribes.

_Michael R. Casillas_

_____

MICHAEL R. CASILLAS

22

## CERTIFICATE OF COMPLIANCE

By affixing my signature below, I hereby certify – based on the word count function of the word-processing software program that was used in connection with the preparation of the instant State's Response Brief – that the entirety of the body of the instant State's Response Brief is comprised of 4,630 words. Additionally, I hereby certify that the relevant portions of the instant State's Response Brief – as defined by Tex. R. App. P. 9.4(i)(1) – are comprised of 3,423 words. Accordingly, I also hereby certify that the number of words in the instant State's Response Brief is in no way in excess of the 15,000-word limit specified in Tex. R. App. P. 9.4(i)(2)(B).

*Michael R. Casillas*

_____
MICHAEL R. CASILLAS

23