**Joel Laundry THOMAS, Appellant,**

v.

**The STATE of Texas.**

**No. 2–93–467–CR.**

Court of Appeals of Texas,
Fort Worth.

April 20, 1995.

Michael W. Berg, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall, Charles M. Mallin, Asst. Chief Appellate Section, Edward L. Wilkinson, Christy Jack, Joetta Keene, Asst. Dist. Attys., Fort Worth, for appellee.

Before DAY, DAUPHINOT and RICHARDS, JJ.

## OPINION

DAY, Justice.

A jury convicted appellant, Joel Laundry Thomas, of aggravated sexual assault and sentenced him to confinement for 60 years. *See* TEX.PENAL CODE ANN. § 22.021 (Vernon 1994). Appellant challenges his conviction through five points of error: (1) the trial court erred by denying his motion for mistrial and motion for new trial due to juror misconduct; (2) the trial court erred by refusing to dismiss the jury array as it did not represent a fair cross section of the community; (3) the trial court erred in denying appellant's motion to dismiss the jury due to the State's peremptory challenge of an African–American venireman; (4) the trial court erred by failing to grant appellant's challenge for cause of a venireman; (5) the trial court erred by denying appellant his right of confrontation by permitting him to cross-examine the complaining witness concerning the jealousy and violence of her boyfriend. Because our discussion of appellant's fifth point of error is dispositive of this appeal, we will limit our analysis to that issue. We sustain appellant's fifth point of error, reverse the judgment of the trial court, and remand for a new trial on the merits.

## FACT SUMMARY

T.G., the complainant, was seventeen years old and a dancer at an Arlington, Texas nightclub named "Hardbodies" at the time of the events in question. On the evening of November 10, 1992, T.G.'s mother confirmed her suspicions that the young woman was dancing at the club. Because she was upset at her mother's discovery, T.G. decided to have a girlfriend drive her to the home of her boyfriend, Jamie Weehunt, to spend the night. T.G. then left "Hardbodies" and went to meet her friend at "Peeping Tom's," the club where the friend worked. T.G. was told that her friend could not leave the club but that appellant, the friend's boyfriend, would give her a ride.

After spending about an hour at "Peeping Tom's," T.G. and appellant left in his blue Chevrolet pickup truck to drive to T.G.'s boyfriend's home on Sargent Street in Fort Worth. T.G. testified that appellant exited Interstate 30 at Collins Street, instead of Oakland, the road leading to Sargent Street and told her that he wanted to see if one of his friends was home before dropping off T.G. According to T.G., appellant drove to some apartments on Collins, parked the truck, and turned off the lights. T.G. said that appellant then tried to kiss her, but she rejected his advances and told him that she wanted to go home.

T.G. said appellant then drove back toward Interstate 30 and exited the freeway at Oakland but ignored her directions to her boyfriend's home. T.G. said that she eventually told appellant that she was going to jump out of the truck and that he accelerated and told her to "Go ahead." She then said appellant drove to a secluded area near Arc Park and stopped the truck, saying that he had to go to the bathroom. Appellant got out of the truck, came around to the passenger side of

the vehicle, placed a bag of clothing which had been on T.G.'s lap in the back seat and crawled on top of her. T.G. said appellant then pulled out a knife and held it against her throat. According to T.G., appellant told her that he could cut her throat and leave her in the park because no one knew where she was. T.G. said the two struggled, appellant dropped the knife, appellant pushed T.G.'s head against the rear window, and he then began choking her. The knife was never found. T.G. said that she struggled with appellant while he unzipped her jacket and began rubbing her body. According to the complainant, appellant said that if she didn't "do it," he wouldn't take her home; T.G. took the phrase "do it" to mean that he wanted to have sex with her. Eventually, T.G. managed to get the door of the truck open and fell out of the truck, but appellant continued to struggle with her and finally pulled down her pants. Appellant, said T.G., managed to put her back into the truck and finally engaged in sexual intercourse with her. She said he ejaculated on her upper thigh.

T.G. said that she "stopped crying so he would think everything was okay and I wasn't going to do anything or tell anybody, because I just wanted him to take me home." T.G. said appellant then drove her to Weehunt's home, which was about five minutes away, dropped her off and drove away quickly. According to T.G., appellant's final comment to her was "Don't be stupid. Don't do anything stupid."

T.G. said she was crying when she knocked on the door of Weehunt's home but replied "Nothing" when he asked her what happened. Finally, T.G. told Weehunt she had been assaulted, and the police were called.

Appellant took the stand in his own defense and admitted that he and T.G. engaged in sexual relations on the evening in question, but he claimed the act was consensual. Appellant said he knew T.G. and saw her on a daily basis because she rode to work with his girlfriend. Appellant claimed that he and T.G. intended to have sex when they left the bar together that evening and also had intercourse on three previous occasions. Appellant denied having a knife, denied attempting to choke T.G. and said that T.G. was sweating, not crying, on the evening in question. Appellant said that T.G. told him she was afraid of getting pregnant, so he withdrew and ejaculated on her leg. He claimed that T.G., while cleaning herself up, told him that her boyfriend "checked her when she comes in" and is "real jealous."

## POINT OF ERROR FIVE

In his fifth point of error, appellant claims that the trial court erred by refusing to allow appellant to cross-examine T.G. about the jealousy and violence of Weehunt. Appellant notes that whether T.G. consented to have sex with him on the evening in question is the central issue in this case, because there were no eyewitnesses, the weapon was never found and the medical evidence was inconclusive.

The trial court allowed appellant to make a bill of exceptions detailing the testimony he desired to offer, and the bill included the following exchange:

[DEFENSE COUNSEL]: Is Jamie very jealous?

[T.G.]: Sometimes.

[DEFENSE COUNSEL]: Does he ever hit you?

[T.G.]: Yes.

[DEFENSE COUNSEL]: Have you ever been scared of him?

[T.G.]: Sometimes.

[DEFENSE COUNSEL]: Do you believe that Jamie would hit you if he thought you were with another man?

[T.G.]: No.

[DEFENSE COUNSEL]: Why not?

[T.G.]: I don't know.

[DEFENSE COUNSEL]: What does he hit you for?

[T.G.]: I don't know, being mad, I guess.

[DEFENSE COUNSEL]: I couldn't hear you.

[T.G.]: Being mad, I guess.

[DEFENSE COUNSEL]: In what way?

[T.G.]: If I don't come home, if I don't call.

The defense attorney then told the trial court that the questions would be limited to

the nature of T.G.'s boyfriend, the fact that he has hit her, and the fact that he is jealous. Counsel argued that he thought the pattern would be a motive for T.G. to lie and would relate to her credibility. Appellant asserts that T.G. could have worried Weehunt would deduce from T.G.'s appearance that she had been with another man and would beat her. The State responded that T.G. testified her boyfriend never hit her because he was jealous, and the trial court sustained the State's objection.

The State responds to appellant's point of error by asserting that appellant failed to establish in examination outside the presence of the jury that Weehunt was "prone" to violence or that T.G. was afraid she would be assaulted by him if he learned she had been unfaithful. The State concedes that T.G. testified that Weehunt was "sometimes" very jealous, that she was "sometimes" "scared of him" and that he had "hit" her; however, the State points out T.G. denied believing that Weehunt would hit her if he thought she was "with another man." The State argues that appellant is attempting to establish his premise through an invalid syllogism: since sometimes Weehunt was jealous, and sometimes he hit her for reasons other than jealousy, he must therefore also strike her when jealous and the victim must fear him. The State contests this interpretation.

■ It is undisputed that T.G. and appellant engaged in sexual intercourse; the only contested issue is whether T.G. consented. Appellant's sole defense to T.G.'s allegation is that the victim fabricated the assault because she feared her boyfriend, whom she admitted was jealous, would beat her for having intercourse with another man. The testimony was relevant and admissible as valid cross-examination.

■ The right to confrontation by cross-examination is a fundamental constitutional right. *Shelby v. State*, 819 S.W.2d 544 (Tex. Crim.App.1991). The exposure of a witness's motivation in testifying is a proper and important function of the right of cross-examination. *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). While extrinsic evidence of specific acts of conduct is generally not admissible to attack a wit-

ness's response, an exception exists where evidence shows bias or motive for the witness to testify untruthfully. *Murdock v. State*, 840 S.W.2d 558 (Tex.App.—Texarkana 1992), *rev'd. on other grounds*, 856 S.W.2d 262. That appellant was deprived of this cross-examination of T.G. does not end our inquiry, however; we must determine whether such denial was harmful.

■ The United States Supreme Court established the appropriate analysis for determining whether a denial of the right to cross-examination under the confrontation clause was harmless error. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Our Court of Criminal Appeals has held a proper analysis of harmless error under *Van Arsdall* requires we employ the factors set out in that opinion. *Shelby*, 819 S.W.2d at 547; *Curry v. State*, 861 S.W.2d 479, 482 (Tex.App.—Fort Worth 1993, pet. ref'd). The *Van Arsdall* factors are:

(1) The importance of the witness's testimony in the prosecution's case;

(2) Whether the testimony was cumulative;

(3) The presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

(4) The extent of cross-examination otherwise permitted; and,

(5) The overall strength of the prosecution's case.

*Curry*, 861 S.W.2d at 482–83. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438; 89 L.Ed.2d at 686–87; *Shelby*, 819 S.W.2d at 547.

T.G.'s testimony was critical to the State's case, particularly since no weapon was ever found and the physical examination after the assault was reported did not indicate any bruising or cuts. In fact, the only physical evidence of bodily contact was that red marks were observed on T.G.'s neck and semen was found on her upper thigh. Both parties admitted they engaged in intercourse, and the only testimony contradicting appellant's assertion that the conduct was voluntary was that of T.G. The overall strength of the prosecution's case was dubious. Thus,

according to the first and fifth *Van Arsdall* factors, the testimony was particularly important. Although appellant could offer no other evidence that T.G.'s boyfriend was jealous or had ever hit her, it was appropriate for the jury to determine T.G.'s credibility during the exchange appellant wished to offer. We understand the State's contention that one could not assume T.G.'s boyfriend would hit her out of jealousy simply because he had hit her for other reasons. However, we note that when T.G. was asked *why* she didn't think that Weehunt would hit her out of jealousy, her response was, "I don't know." Given the testimony from T.G. that her boyfriend had hit her for coming home late without calling, we certainly think that it was relevant for appellant to cross-examine T.G. about Weehunt's jealousy and temper. It was error for the trial court to restrict such testimony, and after evaluating the record in light of *Van Arsdall,* we find the error was harmful. Accordingly, we sustain point of error five. Any analysis of points of error one through four would thus be dicta, and we therefore decline to rule on those points of error.

The judgment of the trial court is reversed, and the case is remanded to the trial court for a new trial on the merits.