

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-17-00371-CR

———————————————————

MARVIN RODRIGUEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1432306D

---

Before Kerr and Birdwell, JJ., and Michael C. Massengale (Former Justice, Sitting by Assignment).
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellant Marvin Rodriguez appeals his conviction for murder. In nine points, appellant contends that the trial court erred in excluding certain testimony and defensive instructions and that the evidence should have compelled the jury to conclude that he acted in sudden passion. We affirm.

## I.    Background

On the afternoon of October 11, 2015, appellant spent the day tailgating outside of Cowboys stadium with a group of his friends and his brothers Candido and Javier. Appellant's group, which was one of many groups of tailgaters at the stadium that day, drank and watched the afternoon game without incident. That evening, though, Candido got into a fight with another tailgater, and the fight spilled over into an all-out brawl. Appellant went to his brother's Hummer, withdrew a gun, and returned to the fray. He first pointed the gun at a man named Lester Peters, threatening him until he left. Appellant then pointed the gun at Rick Sells, another member of their group. A shot went through Sells's neck. Appellant ran back to the Hummer, but he was soon detained. Sells died days later.

Beyond these basic, undisputed facts, the jury heard varying versions of the events surrounding the shooting.

### A.    Candido

Appellant's brother Candido testified that he arrived at the stadium around midday, when the tailgate was already set up. Candido explained that everyone in the

2

group, including his brothers and Sells, got along during the day as they drank and watched the game. But Candido recalled that around 8:15 that night, he was cleaning up when he threw a beer into a pile of trash, and the beer splattered on another tailgater. That tailgater shouted at Candido, and Candido told him to calm down. As Candido turned away, someone punched him in the side of the head. Candido testified that he blacked out momentarily, and when he came to, someone was on top of him choking him and hitting him in the face. Candido yelled out for his brother Javier as he felt blood running down his throat. According to Candido, he could not breathe, and he feared for his life. When he was able to stand, he defended himself by throwing punches, and Sells got involved in the melee too. By Candido's account, his memory was hazy, but at some point his shirt was torn off, and his head was rammed against a wall. Later, a tailgater threw him to the ground, and a crowd again jumped on top of him as he lay face down. Suddenly, Candido heard a gunshot, and he felt the weight lift off of him as the crowd dispersed. Candido stated that after he heard the gunshot, he stood and ran in fear. A friend drove him home. The following day he was treated for a concussion.

## B. Appellant

Appellant testified that the night before the Cowboys game, he was tasked with buying food and drinks for the tailgate. He used his brother Javier's black Hummer to make the trip, and he brought along a pistol because he was concerned about being robbed. The next day, he headed out to the stadium around six in the morning to set

up the tailgate.  Throughout the day, he drank and watched the game along with the other tailgaters, including Sells.

That evening, appellant was standing off to the side when the fighting erupted. He saw Candido get punched and fall to the ground, and a few men surrounded Candido and started kicking him.  Appellant testified that in the chaos that ensued, he at first tried to fend off the attackers with his fists.  Appellant stated that because they were being violently attacked, he feared for his life and the lives of his brothers.  After he was punched multiple times and knocked to the ground, he retrieved his pistol from the Hummer.  According to appellant, his intention was not to shoot anyone, only to scare them away.  He first pointed the pistol at Lester Peters, telling him to "get the fuck out of there."  Peters put his hands up and walked away.  Appellant then stowed the pistol in his waistband and tried to pull men off his brother.  Appellant saw five men around Candido, some of whom were kicking him.  One man was kneeling on Candido and punching him as Candido lay face down and screaming on the ground. Appellant grabbed the man on top of Candido and put him a headlock, with the pistol at his neck.  According to appellant, the man jerked back, someone began pulling on appellant's arm from behind, and "the pistol just—it went off."  Appellant denied that he intentionally pulled the trigger, and he denied that he intended to kill the man, who was later identified as Sells.  Appellant was blinded by the gun blast, and the crowd scattered.  Appellant ran off through the bushes.

## C.    Other Witnesses

Other witnesses, including several bystanders from other groups of tailgaters, gave a somewhat different account of events. According to these witnesses, security officers told the group to start packing up that evening. While picking up trash, Candido got into an argument with a tailgater. The argument soon grew into a fistfight, and other tailgaters tried to separate them. That fight spawned other fights. In one area, a pregnant woman tried to break up the fighting, but she was soon trapped under a group of wrestling men. Witnesses saw Peters, who was with a different group of tailgaters, wade into the fighting to try to help her.

Around the same time, witnesses saw appellant take a swing at another woman and then run off to retrieve a pistol from the Hummer. When appellant returned, he approached Peters and put the gun to his head. According to Peters, appellant roughed him up for thirty seconds to a minute while repeatedly shouting, "[D]o you think I'll do it? Do you think I'll pull the fucking trigger?" Peters's friend testified similarly, saying appellant pointed the gun at Peters for roughly thirty seconds to a minute while shouting, "I will fucking kill you."[1] Peters put his hands up, and eventually appellant released him and dove into the crowd.

Appellant then approached Sells. From bystanders, the jury heard multiple similar accounts of how the shooting unfolded. According to Sells's fiancée, Sells was

---

[1]Another witness said that appellant pointed the gun at Peters for only a couple of seconds.

not involved for most of the fight, but when one fighter tumbled into her leg, Sells went to help break up the brawl. Sells's fiancée testified that he tried to pull Candido from the fight but that appellant pushed Sells away. When Sells again tried to pull Candido from the fight, appellant shot Sells in the neck.

Another bystander agreed that Sells was not initially involved in the fighting, but when Sells later attempted to break up the fight, he was drawn into a wrestling match. The witness testified that by that time, there were only two or three people left fighting, one of whom was Sells. This witness testified that after the wrestlers separated, and as Sells was rising from the ground, appellant abruptly walked up and shot Sells in the neck. Likewise, another witness testified that Sells had been wrestling with a man, and just as Sells tried to stand from the ground, appellant shot him in the neck. The shot rang out less than a minute after appellant had pointed the gun at Peters.

Appellant dropped the gun, which witnesses agreed was the only weapon at the scene. Around this time, police arrived. Witnesses saw—and police footage partially captured—appellant running away and getting into Javier's Hummer. Javier began to drive off, but a responding police officer shouted for Javier to stop. Javier complied. The officer told appellant to exit the vehicle. When appellant did not respond, the officer opened the door, pulled him out, forced him to the ground, and handcuffed him.

Sells was rushed to the hospital. The shot severed his spinal cord and left him without any brain activity. Sells ultimately succumbed to his injuries.

6

## D.    Trial

Appellant was indicted for murder.  He pled not guilty.  The trial court refused appellant's requests to charge the jury on self-defense, defense of a third person, and necessity.  The jury found appellant guilty of murder.

At punishment, the trial court charged the jury to determine whether appellant acted under the influence of sudden passion when he killed Sells.  The jury found that he did not.  They assessed punishment at twenty years' confinement.

## II.    Confession and Avoidance

In his first through fifth points, appellant argues that the trial court erred in refusing to instruct the jury on self-defense, defense of a third person, and necessity. All these points can be resolved by the same stroke, so we take them up together.

Self-defense and necessity are confession-and-avoidance defenses.  *Rogers v. State*, 550 S.W.3d 190, 192 (Tex. Crim. App. 2018).  Defense of a third person is also a confession-and-avoidance defense.  *Henley v. State*, 454 S.W.3d 106, 114 (Tex. App.—Fort Worth 2014), *rev'd on other grounds*, 493 S.W.3d 77 (Tex. Crim. App. 2016).  A defendant claiming entitlement to a confession-and-avoidance defense must admit to each element of the offense, including both the act and the requisite mental state.  *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013); *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013).  An instruction on a confession-and-avoidance defense, therefore, is appropriate only when the defendant's evidence essentially admits to every

element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct. *Cornet*, 417 S.W.3d at 451.

It is undisputed that appellant did not admit the culpable mental state for murder. At trial, appellant repeatedly insisted that the shooting was unintentional and an accident.

However, appellant asserts that under *Martinez v. State*, 775 S.W.2d 645 (Tex. Crim. App. 1989), a defendant may nonetheless be entitled to an instruction on self-defense even if he contends the shooting was unintentional. As appellant observes, older cases cite *Martinez* for the proposition that a defendant may deny criminal intent and still gain access to a self-defense instruction. *See, e.g.*, *Bowen v. State*, 117 S.W.3d 291, 295–96 (Tex. App.—Fort Worth 2003), *rev'd on other grounds*, 162 S.W.3d 226 (Tex. Crim. App. 2005). According to those cases, so long as the defendant admits the underlying actions, he has sufficiently admitted to the commission of the offense. *Id.* For example, one case summarized *Martinez* as follows:

> To rely on "self-defense," the defendant must first admit committing the conduct which forms the basis of the indictment; the defense is inconsistent with a denial of the conduct. . . . However, the Court of Criminal Appeals has explained that "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense. For example, in *Martinez v. State*, the defendant was charged with murder. He admitted to pulling a gun, firing into the air, and having his finger on the trigger when the fatal shot was fired. However, he denied the element of "intent to kill." The Court held he had "sufficiently admit[ted] to the commission of the offense."

*East v. State*, 76 S.W.3d 736, 738 (Tex. App.—Waco 2002, no pet.) (mem. op.) (citations omitted). The *East* court went on to distinguish *Martinez*, though, because the defendant had not only denied the culpable mental state, he had also denied the offensive actions themselves, claiming that another person had committed the assault. *Id.* The court held, "Accordingly, he did not 'substantially admit' to the underlying conduct, and he cannot rely on a claim of 'self-defense.'" *Id.*

We follow the same approach here. Even assuming that *Martinez* is still good law—and there is some reason to doubt that it is[2]—that case does not apply here because appellant did not admit the underlying assaultive acts. Unlike *Martinez*, appellant never admitted "firing" the gun or "having his finger on the trigger when the fatal shot was fired." *See id.* In fact, he carefully avoided making such an admission. Appellant testified that when he put Sells into a headlock, Sells reared back, someone began pulling on appellant's arm from behind, and "the pistol just—it went off." According to appellant, he was "in shock" because he "didn't understand why the pistol went off." On cross-examination, the State pressured appellant to admit the specific mechanism of action that led to Sells's death. Appellant consistently denied any agency

---

[2]*Compare Juarez v. State*, 308 S.W.3d 398, 403 (Tex. Crim. App. 2010) (citing *Martinez* as an exemplar of cases which "ignored the confession and avoidance doctrine altogether" by granting the defendant access to a self-defense instruction without admitting the culpable mental state), *with Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011) (appearing to support *Martinez* by holding, "The Penal Code does not require that a defendant intend the death of an attacker in order to be justified in using deadly force in self-defense.").

9

in the death, insisting several times that the gun simply "went off." At one point, the prosecution submitted to appellant that Sells had "passed away as a result of your gunshot, right?" Appellant framed his response in the passive case: "That was—it was shot from the firearm I was holding, ma'am." Appellant denied having any memory of whether his finger was even on the trigger because, he said, events had unfolded so quickly. Thus, while appellant admitted that he was holding the weapon and that there was a gunshot which led to Sells's death, there was a conspicuous gap in appellant's admission concerning what caused the gunshot itself.

Unlike *Martinez*, appellant refused to take ownership of the lethal act. Appellant therefore had no right to defensive instructions under *Martinez*, if that case remains authoritative. *See Maxwell v. State*, No. 03-06-00473-CR, 2007 WL 2274883, at *2–3 (Tex. App.—Austin Aug. 6, 2007) (mem. op., not designated for publication) (distinguishing *Martinez* and upholding refusal of defensive instruction because "Maxwell admitted only to struggling with Ramirez over his gun, but not to firing the gun or injuring Ramirez"), *pet. struck*, No. PD-1231-07, 2008 WL 151313 (Tex. Crim. App. 2008); *Kimbrough v. State*, 959 S.W.2d 634, 640 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (distinguishing *Martinez* and upholding refusal of defensive instruction because appellant "did not admit to shooting the gun at the complainant, but testified that the complainant's finger was on the trigger when the fatal shot was fired").

Because appellant failed to substantially admit the charged offense, the trial court did not err in denying instructions on self-defense, defense of a third person, and

necessity. *See Cornet*, 417 S.W.3d at 451. We overrule appellant's first through fifth points.

### III.    Sudden Passion

In his sixth and seventh points, appellant contends that the evidence is legally and factually insufficient to support the jury's rejection of sudden passion. He asserts that any rational jury would have found sudden passion after hearing the evidence.

### A.    Applicable Law

Once a defendant has been found guilty of murder, he may raise, at the punishment phase, the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. Tex. Penal Code Ann. § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is reduced to a second-degree felony. *Id.* "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation. *Id.* § 19.02(a)(2). An "adequate cause" is one that would "commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet.

11

ref'd); *Rodriguez-Olivas v. State*, No. 02-13-00520-CR, 2015 WL 6081773, at \*19 (Tex. App.—Fort Worth Oct. 15, 2015, pet. ref'd) (mem. op., not designated for publication); *see Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013). For this reason, a finding on sudden passion may be evaluated for legal and factual sufficiency. *Gaona*, 498 S.W.3d at 710.

In reviewing the legal sufficiency of the evidence to support an adverse finding on sudden passion, we first look for a scintilla of evidence to support the jury's negative finding on sudden passion and disregard all evidence to the contrary unless a reasonable fact finder could not. *See Matlock*, 392 S.W.3d at 669. If no evidence supports the jury's finding, then we search the record to see if the defendant had established the contrary proposition as a matter of law. *See id.* at 669–70.

In our factual-sufficiency review, we view the entirety of the evidence in a neutral light, but we may not usurp the function of the jury by substituting our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.* at 671. Therefore, an appellate court may sustain a defendant's factual-sufficiency claim only if the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.*

## B.    Sufficiency

We first examine the record to determine whether more than a scintilla of evidence supported the jury's rejection of sudden passion.

Appellant's entry into the fight suggests that his actions were not due to any provocation by Sells. One witness testified that appellant's only prior involvement in the brawl was wrestling and then attempting to punch a woman. This witness testified that after appellant swung at the woman, he went to get a weapon.

Appellant testified, to the contrary, that he was punched multiple times and knocked down before he went to retrieve the gun. However, there was no evidence that appellant was punched by Sells or one acting with him. Instead, there was consensus among disinterested witnesses that Sells was solely a bystander during the early stages of the fight. Thus, even assuming that appellant was struck, the blow that might have initially stoked appellant's fear and anger was delivered by another person unconnected to Sells.

Appellant argues that the true provocation was not the fact that he was struck. Rather, it was the fact that several men—with Sells chief among them—were severely beating his brother, causing appellant to fear for his brother's life. There are multiple problems with this argument.

First, there was no evidence that anyone had a weapon besides appellant. On any view of the record, this should have mitigated appellant's fear at least somewhat. *See Moncivais v. State*, 425 S.W.3d 403, 409 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (finding evidence sufficient to reject sudden passion in part because appellant's "gun was the only weapon displayed during the fight and no one else was seen carrying a weapon").

13

Second, this testimony—that there was a gang-beating of Candido, led by Sells—came predominately from two interested witnesses: appellant and Candido. Their accounts were undercut by photographs of the brothers taken that night and the following day, which might have led a reasonable juror to question the severity of their injuries. The brothers' accounts were also undercut by disinterested witnesses who gave much less dire descriptions of the encounter. Those witnesses instead described it as, at most, a one-on-one wrestling match instigated by Candido after Sells attempted to break up the fight. One witness testified that Candido and Sells were among the last people fighting, after the brawl had died down. According to that witness, appellant shot Sells so abruptly that Sells could not have done something to warrant being shot— "he didn't have a chance" to.

Third, even though wrestling with one's brother may be slightly provocative, there was testimony that Sells was no longer fighting with Candido by the time appellant fired. According to disinterested witnesses, the wrestling had stopped, and Sells was rising from the ground as appellant shot him. Thus, whatever slight provocation Sells may have made, it was already abating by the time of the shooting. *See Gaona*, 498 S.W.3d at 711 (concluding that the evidence was legally sufficient to support rejection of sudden passion, noting that the decedent was already walking away at the time of the murder).

Fourth, another set of facts suggests that appellant needed little provocation in order to come to the point of murder. Just seconds before he shot Sells, appellant had

put a gun to Peters's head and, according to many, threatened to kill him. It is undisputed that Peters was not attacking Candido, and yet appellant had come to the brink of killing Peters. The jury therefore could have rationally concluded that Sells did not need to be viciously attacking Candido in order for appellant to desire to kill him.

There is far more than a scintilla of evidence to show that appellant's animus and actions were not tied to any adequate provocation by Sells or one acting with him. The evidence is legally sufficient to support the jury's rejection of sudden passion. *See Matlock*, 392 S.W.3d at 669.

We next consider whether the evidence was factually sufficient to support the jury's rejection of sudden passion. Appellant emphasizes the testimony that he was responding to two instances where a group of men pounced on and beat his brother, that appellant was outnumbered and afraid, and that the scene was chaotic and violent.

After reviewing the entirety of the record evidence in a neutral light, we find this case comparable to *Huizar v. State*, 720 S.W.2d 651 (Tex. App.—San Antonio 1986, pet. ref'd). There, the Huizar brothers stopped at an auto garage and "ended up in a brawl with about eight of the people" there, though there were varying accounts of who started the trouble. *Id.* at 652. Martin Huizar drove away, leaving his brother Joseph at the scene. *Id.* Martin immediately drove two blocks to his home and told his father, the defendant, that Joseph "was being severely beaten and may even have been killed." The defendant "panicked" and, believing "it was immediately necessary to do

something to rescue his son" Joseph, "raced" to the garage with a gun in a frantic state. *Id.* Unbeknownst to the defendant, Joseph had managed to escape the garage. *Id.*

Everyone had left the garage but two men—Hernandez and the eventual victim, Ballesteros. *Id.* According to Hernandez, Ballesteros had not taken "part in the fight but had attempted to stop it." *Id.* After he was unsuccessful in breaking up the fight, Ballesteros began closing the garage for the day. *Id.* The Huizar brothers disputed this, asserting that Ballesteros was involved in the brawl. *Id.*

When Martin and the defendant pulled up to the garage, Ballesteros and Hernandez jumped in a car and fled. *Id.* The Huizars followed; they testified that when they saw the car speed away, they believed that Joseph, either badly beaten or dead, was in the car. *Id.* The defendant chased down Ballesteros's car and fired a shot through its window. *Id.* The defendant approached the car, flung open the door, and shot Ballesteros in the neck. *Id.* at 653. Ballesteros later died. *Id.* The defendant denied that he intended to kill Ballesteros. *Id.* The trial court denied a sudden passion charge, and the jury found the defendant guilty of murder. *Id.* The appellate court held that the evidence was insufficient to raise sudden passion. *Id.* "Under the State's evidence, Ballesteros was shot as he lay, without struggling, in the car," and though the defendant was frantic, that emotional state could not be traced to any present action of the victim. *See id.*

While *Huizar* comes from a different arena and era of law—charge error circa 1986, rather than factual sufficiency in the post-*Brooks* era—we find its sentiments on

point here. As in *Huizar*, there was credible testimony that the victim had merely attempted to break up a brawl that appellant's family member may well have instigated, only to be abruptly shot in the neck after appellant returned with a gun. Like *Huizar*, appellant denied that he intended to kill the victim. Though there was testimony concerning appellant's charged emotional state and the violence done to his relatives, like *Huizar*, there was ample conflicting evidence to show that that emotional state was not traceable to any provocation by the victim that would amount to adequate cause. As in *Huizar*, we conclude that the result in the trial court was the correct one. Viewing all the evidence in a neutral light, we cannot conclude that the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *See Matlock*, 392 S.W.3d at 671. The evidence is factually sufficient to support the verdict.

We overrule appellant's sixth and seventh points.

## IV. Exclusion of Expert Testimony

In his eighth point, appellant contends that the trial court reversibly erred in excluding the expert testimony of Dr. James D. Weathers, a board-certified and highly experienced practitioner of emergency medicine. On voir dire, Weathers diagnosed, based on photographs, the injuries that appellant and Javier manifested after the fight, which mostly consisted of light bruising and cuts. Weathers sought to characterize the fight as a "violent brawl" and explained that the fighting could have resulted in much more severe injuries, organ damage, and possibly even death.

17

Appellant contends that this opinion was vital in that it would have countered the State's position, which emphasized "the incongruity of defending oneself with a handgun during a 'mere' fistfight." According to appellant, Weathers's testimony would have underscored that appellant was facing a potentially lethal situation, rendering his actions more understandable in terms of sudden passion and self-defense.

At the close of voir dire, the State objected that the meat of Weather's testimony—that appellant and his brother suffered injuries, that the fighting was violent, and that it could have caused more serious injuries—was "not particularly specialized knowledge, that it is not information that isn't already possessed by the jury." The State echoes this objection as its principal argument on appeal, contending that these facts would have already been within the ken of the average juror.

Trial court decisions to admit or exclude evidence will not be reversed absent an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the "zone of reasonable disagreement." *Id.*

An expert witness may testify only "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. To be admissible, the expert's knowledge and experience on a relevant issue must be shown to be beyond that of the average juror and it must be shown that his testimony will help the jury understand the evidence or determine a fact issue. *Ernst v. State*, No. 13-06-00064-CR, 2011 WL 5182599, at *4

(Tex. App.—Corpus Christi–Edinburg Oct. 27, 2011, no pet.) (mem. op., not designated for publication); *Gonzalez v. State*, 301 S.W.3d 393, 397 (Tex. App.—El Paso 2009, pet. ref'd). When the jury is equally competent to form an opinion about a fact issue, or the expert's testimony is within the common knowledge of the jury, the trial court may exclude the expert's testimony. *See Moses v. State*, No. 05-16-01391-CR, 2018 WL 4042359, at *11 (Tex. App.—Dallas Aug. 23, 2018, pet. ref'd) (mem. op., not designated for publication); *Gonzalez*, 301 S.W.3d at 397; *Blumenstetter v. State*, 135 S.W.3d 234, 248–49 (Tex. App.—Texarkana 2004, no pet.); *cf. Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010) ("An expert must possess some additional knowledge or expertise beyond that possessed by the average person, but the gap need not necessarily be monumental . . . .").

The trial court could have rationally concluded that Weathers's testimony duplicated what was already within the basic perception of every juror. While we might have ruled differently, we cannot say that the trial court's decision was wholly outside the zone of reasonable disagreement. *See Beham*, 559 S.W.3d at 478. We therefore conclude that the trial court did not abuse its discretion.

We overrule appellant's eighth point.

## V.    Exclusion of Peters's Statements

By his ninth point, appellant complains that the trial court wrongly excluded testimony concerning Peters's statements at the scene. Appellant would have testified that during the fight, Peters said "I got your back, I got your back" to one of the other

combatants. Appellant argues that these statements would have shed light on why appellant put a gun to Peters's head. The trial court excluded the testimony as hearsay.

However, even assuming that exclusion of this testimony was error—which we do not decide—appellant would be required to show harm. Under rule 44.2(b), reversal is required only if the trial court's non-constitutional error affected appellant's substantial rights. Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In determining whether an error affected an appellant's substantial rights, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

Peters's statements would have added at least some context to the events of that night; those statements would have reinforced, slightly, the fact that Peters was a

participant in the fight. However, there was already plenty of similar contextual evidence, as nearly every witness agreed that there was a widespread brawl involving nearly a dozen tailgaters, including Peters. *See Thomas v. State*, 897 S.W.2d 539, 542 (Tex. App.—Fort Worth 1995, no pet.) (noting that exclusion of cumulative testimony was more forgivable in harm analysis).

True, admission of these statements would have made appellant's conduct towards Peters somewhat more explainable. But appellant was not on trial for pointing a weapon at Peters, and his state of mind with regard to Peters was not an element of the offense. The charged offense was shooting and killing Sells, and there was unassailable evidence that appellant shot and killed Sells. By the end of the case, the only real issues for the jury were appellant's intent and whether appellant committed those actions in sudden passion stemming from adequate provocation *by Sells*. Provocative statements *by Peters* would have had little bearing on these issues. Thus, considering the nature of the evidence supporting the verdict and how the alleged error would be considered in connection with the other evidence, *see Motilla*, 78 S.W.3d at 355, we conclude that any error would have had only slight effect on the jury's consideration. *See Solomon*, 49 S.W.3d at 365. Because any error was harmless, we overrule appellant's ninth and final point. *See Haley*, 173 S.W.3d at 518.

21

## VI.  Conclusion

We affirm the judgment of the trial court.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 1, 2019